*345 OPINION.
Trammell:
The two issues presented in these proceedings are: (1) Whether the petitioner was a personal service corporation for the *346 years 1918 through 1921, and (2) the deductibility of the amount of $8,125 allowed by the respondent in determining the proposed deficiency for 1921.
With respect to the first issue, section 200 of the Revenue Acts of 1918 and 1921 defines a personal service corporation to be—
A corporation whose income is to be ascribed primarily to tbe activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include * * * any corporation 50 per centum or more of whose gross income consists * * * of gains, profits, or income derived from trading as a principal * * *.
The first requirement of the statute is that the corporation’s income be ascribable primarily to the activities of the principal owners or stockholders.
During the years involved in these proceedings the petitioner was engaged in the live stock commission business acting as agent for shippers and purchasers of live stock. It did not in any case purchase or sell live stock on its own account nor did it have any interest in the live stock. Its business was that of dealing for others on a commission basis, receiving as compensation for its services a certain amount per head or per car of stock handled by it. Its compensation was not even dependent on the amount or consideration for which the stock sold.
All of the stockholders were regularly engaged in the active conduct of the business. With the exception of Horine they consulted with customers as to the condition of the stock, the time for purchasing stock to feed, the time to sell, and as to market conditions generally. They sorted or assisted in sorting the stock. They managed the affairs of the office, directed and supervised the activities of the salesmen, buyers, yardmen and office employees.
The petitioner employed salesmen whose duties were to look over stock in the country, to see if it were ready for market, sort and help sort stock, seek buyers therefor, and sell the stock. Buyers were employed to locate and to buy cattle on orders for customers. As a rule the salesmen and buyers did not consummate sales or purchases, until after one or more of the stockholders had considered the proposed action and had directed or authorized the sale or purchase to be closed. In some instances, however, the buyers went out into the country and made purchases. Yard men were employed in getting stock from the cars to the pens, caring for it, taking it to the scales and seeing that it was properly weighed. The services rendered by these men were menial in character.
In 1918, the petitioner employed 4 salesmen at salaries ranging from $1,200 to $4,500; 4 buyers at salaries from $1,320 to $2,700, and *347 three yard men at salaries of from $1,460 to $1,800. In 1919 it employed 2 salesmen at salaries of $1,200 and $4,800; 8 buyers at salaries of $1,500, $1,725, and $3,000; and 8 yard men at salaries ranging from $1,050 to $2,900. In 1920 the petitioner employed 4 salesmen whose salaries ranged from $1,300 to $6,000, 3 buyers — 2 of whom received a salary of $1,800 each, and the other $2,700, and seven yard men at salaries of from $1,225 to $2,200. In 1921, 4 salesmen were employed at salaries of from $1,300 to $4,800, 2 buyers — one of whom received a salary of $1,800 and the other $3,150, and 6 yard men, whose salaries ranged from $1,050 to $2,220. During these years the number of petitioner’s office employees varied from 1 in 1919 to 3 in 1921. In addition to the foregoing, all of whom received salaries in excess of $1,000 each per annum, the petitioner had other employees, each of whom received less than $1,000 per year.
In 1918, the petitioner employed 11 salesmen, buyers, and yard men, while it employed 13 in 1919,14 in 1920, and 12 in 1921. Practically all the salesmen and buyers were members of the live stock exchange. As such members they were regulated in their conduct according to the rules of the exchange and were held personally responsible to the exchange for every violation of the rules prescribed. While their services were under the direction and subject to the supervision of one of the stockholders, in some instances buyers would go out in the country and buy cattle for customers. They were high-salaried men. The services which they performed were a substantial and material part of the services rendered by the corporation. While as a rule these persons acted under the direction of a stockholder in making sales or purchases, other important services were rendered independently. They went out to inspect cattle, sorted them out and determined if and when they were ready for sale. They located cattle to be bought or sold and sometimes bought on orders from customers. They came in direct contact with the people with whom they did business. They were the persons who did the bargaining in the purchases and sales. The services of these persons were different in their nature and importance from the services rendered by the employees in the case of Fuller & Smith v. Routzalin 23 Fed. (2d) 959. In that case the court said:
On the whole, it must be found that the employees to whom these salaries were paid, were clerks and assistants, such as are found in every law office and whose work has no material relation to the success of the business, either as a business getter or as a directing head.
The compensation paid to employees in 1918 who received more than $1,000 per annum was in excess of $29,000 and in addition the petitioner paid in excess of $8,000 for that year to other employees, making a total of more than $37,000. Approximately the same total *348 compensation was paid for 1919. It was in excess of $36,000 for 1920, and in excess of $34,000 for 1921. The total income from commissions for 1918 was $95,760.07; for 1919, $97,190.13; for 1920, $81,767.20; and for 1921, $88,801.32.
In the conduct of its business, the petitioner relied to a substantial extent on the services of nonstockholders. We think that what we said in Patterson-Andress Co., 6 B. T. A. 392, is applicable here. There we said :
In our opinion this clause means more than that the stockholders shall obtain the clients and supervise the work, or that clients shall look to their experience; it means, among other things, that the corporation may not rely upon non-stockholders to do a substantial amount of the work which produces the income whether such work be detailed or supervisory. Just as another clause excludes from personal service classification those corporations where capital contributes materially to the income, so does this clause exclude corporations where the services of employees so contribute. .
We can not find that the services of the nonstockholding employees taken as a whole was not a material income-producing factor or that in view of the services of such employees the income was to be ascribed primarily to the activities of the principal stockholders.
In Hubbard-Ragsdale Co. v. Dean, 15 Fed. (2d) 410, the court said:
The plaintiff claims the benefit of an exception to the general method and extent of taxing corporations. The burden is upon the plaintiff to show that it clearly comes within the terms of such exception. “ In such cases, a reasonable doubt is fatal to the claim. Prima facie every presumption is against it. It is only when the terms of the concession are too explicit to admit fairly of any other construction that the proposition can be supported.” West Wisconsin R. R. Co. v. Supervisors, 93 U. S. 595, (23 L. Ed. 814). See also Lee v. Sturges, 46 Ohio St. 153, 159, 19 N. E. 560, 2 L. R. A. 556.
With respect to the question as to whether capital was a material income-producing factor, we have found that where petitioner purchased live stock for a customer a check usually was received at the time the purchase was made. However, in some instances where the purchaser was financially responsible the cattle were shipped to the customer, upon whom was drawn a draft which was deposited to the credit of the petitioner. This amounted to an extension of credit and the use of capital under similar circumstances as those presented in the case of Hubbard-Ragsdale Co. v. Dean, supra, where the court said:
Vendors were paid by the plaintiff’s checks; vendees were extended credit, secured by the bills of lading until drafts could be collected, and it must be assumed that payment of vendors immediately and the extension of credit to vendees rather than requiring a cash advance upon the purchase were necessitated by the nature of the business and existing competition and for the purpose of holding trade. Credits were also secured from banks in the discount of drafts.
*349 While we do not know the extent to which capital in this form was used, we can not say that as so used it did not contribute materially to the business success. See Prey Brothers Live Stock Commission, 9 B. T. A. 534.
As a result of the method by which the business was operated, the petitioner’s bank account usually showed a substantial credit balance composed chiefly of amounts due customers. From this balance it made accommodation loans to certain of its old customers from whom it usually received notes. It was necessary for the petitioner from time to time to discount some of the notes as other loans were made. The amounts of these loans to customers are set out in the findings of fact.
In connection with its loans the petitioner received and paid interest as follows:
[[Image here]]
As a result of loans the petitioner had bad debts of $3,551.77 and $3,024.55 for 1918 and 1921, respectively, which were much in excess of net amount of interest received for those years.
The petitioner contends that since the total net amount of interest, $9,891.07, less total bad debts of $6,576.32, is only $3,314.75 for the four years, or an average of $828.68 per year, income from interest did not constitute a material portion of its income.
The petitioner’s income from commissions on ljive stock and interest was as follows:
[[Image here]]
Gross income from interest constituted the following percentages of total gross income for the years indicated:
Per cent
1918. 10.81
1910. 9.37
1920. 10.04
1021. 7.43
*350 The petitioner in effect borrowed the greater portion of the money which it loaned from banks by discounting the notes and paying out to the banks most of the interest that was payable to it.
While there is testimony that the primary purpose in making these loans was to accommodate its old customers and not for the primary purpose of receiving any income from such transactions, the fact is that the gross amount received is not an insignificant amount. We must look to the gross amount received from such source and not the net amount. See Denver Live Stock Commission Co., 1 B. T. A. 985. The gross amount of interest received is, in our opinion, a material part of the total gross income. In the case of Fuller & Smith v. Routzahn, supra», where the court held that the capital used by that company was not a material income-producing factor, the corporation received only .16 per cent of its income for 1918 from interest on funds loaned to its stockholders. Of its total earnings, 99.24 per cent was from personal services.
Even, however, if the interest itself received from the loans be held not to be a material part of the income of the petitioner, we can not say to what extent the making of the loans actually contributed to receiving the business or a material part of it. If these loans, through the good will created thereby or otherwise, held Customers or added new ones, the money used was an income-producing factor aside from the mere interest received therefrom. It was doubtless necessary or advisable as the result of competition or otherwise to make these loans. In making them a very substantial amount of capital was used. Whether it was invested or borrowed is immaterial.
In view of all the evidence, in our opinion, the petitioner does not meet the tests prescribed by the statute to entitle it to personal service classification.
With respect to the second issue, the respondent at the hearing amended his answer so as to allege that he erred in allowing the deductions totaling $8,125 taken by the petitioner as expense. The respondent contends that the amounts were not an expense but represented a distribution of profits to the stockholders on the basis of $12.50 per share.
The respondent introduced no evidence in support of his contention nor did he develop from the witnesses produced by the petitioner any testimony which indicates that the amount was not an allowable deduction. The burden being on the respondent to establish his contention, and having failed to submit any evidence in support thereof, the contention set up in his answer must be denied.

Judgment will be entered on 15 days’ notice, wider Rule 50.